**ROBERTSON et al. v. INGRAM et ux.**

No. 16667—Opinion Filed May 25, 1926.

Rehearing Denied Jan. 4, 1927.

1. **Appeal and Error — Review—Sufficiency of Evidence in Law Action Tried to Court.**

In a law action, where a jury is waived and the cause is submitted to the court, the judgment of the trial court will not be dis-

turbed where there is any evidence reasonably tending to support the same.

## 2. Disposition of Cause.

As to one item of damages, the evidence does and as to the other does not reasonably tend to support the findings and judgment in favor of plaintiffs; and the data being insufficient for affirmance of the judgment on one item and for adjusting the equities between the parties, the judgment is reversed and the cause remanded for new trial.

(Syllabus by Estes, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Muskogee County; Enloe V. Vernor, Judge.

Action by A. T. Ingram and wife against R. S. Robertson et al. From a judgment for plaintiffs, defendants appeal. Reversed and remanded for new trial.

Daily & Woods and Leopold & Brett, for plaintiffs in error.

Neff & Neff and Harry G. Davis, for defendants in error.

Opinion by ESTES, C. Parties will be referred to as they appeared in the trial court, inverse to their order here. During and prior to 1913, plaintiff, A. T. Ingram, owned a building and lot in the town of Porum, in which he conducted his mercantile business. He owed Atkinson-Williams Hardware Company, Reynolds. Davis Grocery Company, and the Berry-Beall Dry Goods Company, Arkansas corporations of Ft. Smith, large sums for goods. In 1913, the business was incorporated under the name Ingram Trading Company, and he and his wife conveyed said real estate to the corporation to obtain credit for past and future obligations. In 1915, plaintiffs. Ingram and wife, executed to defendant Robertson as trustee for said corporations, deeds of conveyance for other real estate in the town of Porum and certain farm lands belonging to plaintiffs to secure three promissory notes, which the Ingram Trading Company had theretofore delivered to said corporations, aggregating $16,681.28, and for future credit; and also the Ingram Trading Company in the same year conveyed to Robertson the said business property in Porum for the same purpose. From 1913 to 1918 defendants maintained agents who assisted in the conduct of the business. under which arrangement credit was extended by said corporations to Ingram Trading Company and payments made of new and current bills and also several payments made on said three notes. In March, 1921, Ingram Trading Company was adjudged a bankrupt. In 1923, plain-

tiffs commenced this action, alleging that said deeds were intended to be mortgages and that all indebtedness had been paid to defendant trustee for said corporations, and praying cancellation of said deeds and for accounting on certain rents collected by defendants. Defendants answered that said deeds were in fact mortgages, given for the purposes alleged by plaintiffs; denied payment of the indebtedness; alleged that at the time of the bankruptcy there was $14,396.72 due on said notes and on account; that the trustee, Robertson, had purchased said business lot and also received certain notes from the trustee in bankruptcy of Ingram Trading Company for which credit of $6.000 should be given, and, after deducting all of same, claimed a balance of $6,864.46 with interest, and prayed judgment against plaintiffs for said amount and for foreclosure and sale of the real estate under said deeds as mortgages. On the trial, plaintiffs admitted the execution of said notes and the amounts claimed thereon. Under the allegation of payment in the petition, plaintiffs undertook to show that they were entitled to recoupment against said corporations for $10,000 in this wise: that in 1914 the trading company shipped 382 bales of cotton to Robertson, trustee, for credit under an agreement that same should not be sold until March 1, 1915; that said trustee sold same in December, 1914, by which sale a profit in said sum was lost to plaintiffs. They also claimed that from 1913 until 1918, de.endants, at different times, had four different men running the business of the trading company for whose services the trading company had been charged about $7,000 by defendants, which amount was also claimed by way of recoupment. The cause was tried in equity, without a jury, the court finding the issues for the plaintiffs and against the defendants, decreeing the deeds to be mortgages, finding that all indebtedness claimed by defendants had been paid by plaintiffs, canceling said deeds and rendering an affirmative judgment for plaintiffs for $850. The assignments of error of defendants involve the question whether said judgment is supported by the evidence. on the two items of recoupment claimed by plaintiffs.

Ingram testified. in substance, that, in 1914 (incident to the great war), cotton was selling for five and six cents the pound and the patrons of his store, the farmers indebted to the trading company, were refusing to pick their cotton: that he made an arrangement with the trustee, Robertson. whereby the farmers were grubstaked out of the store for picking the cotton and is-

sued tickets to each farmer by which his cotton was to be shipped to the trustee at Ft. Smith for credit; that in December, 1914, he had thus shipped 382 bales, at which time Robertson called him and said he could get seven and three-sixteenth cents per pound and asked permission to sell; that he told Robertson that if same was sold, it would be over his protest; that Robertson nevertheless did sell same for said price, and if same had been held until March 1st, it could have been sold at twelve and one-half cents, by which the trading company had realized additional profit of $10,000. On cross-examination, Ingram admitted he said to Robertson: "I can't afford to do that, but if you do, you have got the bales all right; the cotton is in your hands, and if you sell it you place 100 bales for me on the board to try to protect me." This is not an objection to the sale of the cotton, but amounts to full consent when connected with Ingram's letter in reply to Robertson's in May of 1915, in which Ingram recognizes sale of the 100 bales on the board and accepts and approves credit for net profit of more than $1,200 thus realized. Defendants introduced a letter dated January 1, 1915, signed by Ingram, stating: "In reply to yours of 28th ult. beg to advise that we are willing to take your judgment as to the handling of all the cotton we have sent you this fall. Any time you think it best to sell, it is all right with me." Ingram explained that the date, 1915, was a mistake; that the letter was written January 1, 1916, and referred to certain other cotton that had been shipped in 1915. However, this explanation is not very convincing because of the manner in which same was adduced and because of said admission above and other facts and circumstances. Two of the plaintiffs' witnesses testified that the condition on which the cotton was shipped to Robertson was that it should be sold "not later than March 1, 1915." The 'phone conversation with reference to the sale of this cotton is admitted by Ingram to have been in December, 1914. The 100 bales of futures is admitted to have been purchased in December, 1914, and sold in May, 1915, and the profit agreed upon and credited. Ingram admits that in the following month, June 7, 1915, after closing the transaction for the 100 bales, he renewed one of the said notes given to one of said corporations, being one of the notes now in controversy; that he never disputed the amount of this note or the other two notes, or claimed that they had been wiped out by the cotton transaction with Robertson until the bringing of this suit in 1923; that in 1919 he gave a credit statement to another

wholesale house, introduced in evidence, in which he named the said three corporations as his merchandise creditors, stating that he could not tell the amount due each, but that the total due the three was $18,000; that in 1920 he made a written statement for his company to one of said creditor corporations, introduced in evidence, in which he named said three corporations as his creditors, showing a total of $9,727.68 due; that he had received statements from each of said corporations from 1914 until about 1920, showing the amounts claimed by each, and had meetings with the officers of such corporations, and did not at any time protest against the amount so claimed by each, nor did he suggest that such amounts should be offset by damages in the cotton transaction. We do not consider these written credit statements and his failure to claim damages on account of the cotton transaction as absolute admissions against interest, because, during that time, he was dependent upon defendants for further credit to continue his business, and may have been under some financial compulsion. However, they are at least circumstances to be considered in connection with said letters to determine whether Ingram consented to the sale of the cotton when same was sold in December, 1914; that is, whether his explanation of his letter of January 1, 1915, is correct. If the cotton had been sold contrary to his protest, it is almost unreasonable that he did not broach or mention the matter at all from 1914 until 1923, knowing that such claim was unliquidated. The testimony of defendants is positive that Ingram did consent to such sale in December, 1914, on the condition that said futures be purchased. Whatever restraint he suffered did not prevent him for such long time from suggesting or asking recoupment for such damages as he now claims. We think he wrote the letter dated January 1, 1915, on that date. Without that letter the evidence is insufficient to support the finding of the court in favor of plaintiffs for $10,000. With the letter, said finding is not only against the clear weight of the evidence, but there is no evidence reasonably tending to support the same.

The burden was on plaintiffs in the first instance to show that the four men were agents of defendants and the amount that had been paid out of the funds of the trading company for their services, in order to be entitled to recoup therefor, since the onus probandi was on plaintiffs to support their plea of payment of the admitted notes set up by defendants; and then the burden

devolved upon defendants to prove the agreement of plaintiffs to pay such agents. Such agents were paid in part directly out of the funds of the trading company, and in part directly by defendants, but the latter payments were charged against the account of the trading company. The court found:

"I am of the opinion they were forced upon him and as far as having done any good or benefit obtained from their services, it would seem there was none. * * * The evidence does not show Mr. Ingram asked for such representatives nor offered to pay them until it was demanded of him that such a person be placed in the store. Then, if that be true, I feel that any such representative should be and was the employee of the creditor, whom they represented and worked for, and the creditors should have paid the wage."

The court held the damages sustained by plaintiffs on the cotton and the wages chargeable to defendants balanced the amount claimed by defendants on the notes, allowing the $850 judgment in favor of plaintiffs as the difference between the rents received by defendants on the real estate and expenses paid out thereon. The only evidence of the amount of such salaries is that of Ingram, who testified that same was "around $7,000," which, we think, is too indefinite and uncertain for judicial determination as to the amount, since he did not testify from his books of account, and the other circumstances show he was guessing somewhat as to the amount. Since the cause must be returned for new trial, the burden will be on plaintiffs in this behalf. Defendants seem to have recognized that the burden was upon them to prove Ingram's agreement to pay the salaries. However, the only issue was the amount of the indebtedness between the parties and had become a law action in which a jury was waived and the cause submitted to the court, in which state of case the judgment of the trial court will not be disturbed where there is any evidence reasonably tending to support the same. Drum et al. v. Crews et al., 117 Okla. 92, 244 Pac. 774. It thus remains to determine whether there is any evidence reasonably tending to support the finding, in effect, that the trading company, through Ingram, did not agree to pay said salaries—in effect, that the agents were forced upon Ingram, and therefore there was not such consent as to constitute his agreement to pay.

The arrangement was not in writing. The trustee, Robertson, testified:

"Well, we told him we wanted a representative out there and that the Ingram Trading Company would have to pay him, and Mr. Ingram asked us who we wanted, or whom we could get, and we told him we thought we could get Mr. H. M. Nichols. I took the matter up with Mr. Nichols, and he said he would go there for $150 a month."

Robertson then stated his conclusion that:

"The Ingram Trading Company, that was to be incorporated, was to pay his salary. * * * We told him that we would not be willing for the business to be continued unless we had some one out there—in a way to represent us, but the Ingram Trading Company was to pay his salary. These men were not working for us, but we thought the business could be handled better if some one we knew was out there. * * * Whenever he (Ingram) came down there to talk over his affairs, he would say he would like to get rid of that expense; that he was capable of going ahead and running his own business—getting a cheaper man—and he wanted us to take our man away—the man we had out there at the time he would be talking, whoever was out there the different times. I don't think there was any occasion he didn't talk that way, and we always told him we could not do that; that it would have to be some one we thought ought to be there."

Evidence to practically the same effect was adduced from other witnesses of the defendants. The foregoing constitutes some evidence tending to show by the witnesses for defendants that, although Ingram may have agreed to pay said salaries, these men were the agents and acting on behalf of defendants, and that Ingram's consent to pay them may have been enforced or involuntary. Ingram testified that, although he knew the salaries were charged to the trading company, the agents were not his employees; that Mr. Nichols, first sent by the defendants, became one of the incorporators of the Ingram Trading Company in 1913 and secretary thereof while he was thus representing defendants; that "I had the same bunch of clerks before they came and after they came, that they didn't lend any relief."

The foregoing, and other circumstances, constitute some evidence reasonably tending to support said finding of the court. There is much evidence tending to contravene the same, including one letter in which Ingram remitted for the first month salary of Nichols, but such payment is not altogether inconsistent with the finding of the court that the same was involuntary. Ingram also admits that he received statements from the creditors in which such salaries were charged to the trading company during the several years. The principles of estoppel or acquiescence are not applicable to Ingram with respect to the salaries in manner as they are in the case of the cotton transaction.

There, the alleged damages accrued in 1914 and he did not mention it until 1923, concurring in the amounts claimed. With reference to the salaries, he continually protested, and it is not clear that he consented in the first instance.

In 1921, defendants filed their claims on their notes and open accounts against the estate of the Ingram Trading Company, bankrupt, and entered into a stipulation that their claims were secured by said business property, in Porum and by notes of the face value of $3,688.76, payable to the trading company, but held as collateral security for the notes in controversy; that the probable value of the real estate and notes was less than the indebtedness and that the trustee in bankruptcy should relinquish all claims to the collateral notes and quitclaim said real estate to Robertson, trustee for the defendants, and that the defendants should not share in the general assets of the estate. The order approving the said stipulation recited that the trustee in bankruptcy was "authorized to relinquish all his right, title, or interest in and to the security held by said creditors or either of them by proper instruments in writing." We think, under this order, the quitclaim deed to the property to Robertson and the delivery of the collateral notes to him amounted simply to a release by the trustee in bankruptcy of onerous property and did not change the status of the title of the real estate and collateral notes; that Robertson, trustee for the creditors, still held them as security for the indebtedness herein. Since the business property was conveyed by plaintiffs to Ingram Trading Company for credit purposes, and by that company conveyed to the trustee, Robertson, as security, any equity therein would revert to Ingram on payment of the indebtedness. The whole affair has been much protracted and thus complicated. On retrial, plaintiffs should prove by competent evidence the amount of salaries paid by and charged to the Ingram Trading Company. The court should determine the amount due defendants on their notes and open accounts set up by them, and charge defendants with the rental value of the real estate held by them under the deeds involved in this case, less credits for taxes, repairs, insurance and the like and hold defendants for the value of said collateral notes released by the trustee in bankruptcy; and strike a general balance between the parties accordingly, rendering judgment in favor of the party entitled thereto. If thus the amount due plaintiffs is equal to their admitted indebtedness to defendants, the court will decree cancellation of the said deeds and quiet title to the real estate in plaintiffs and render judgment for plaintiffs against defendants, if the amount found due plaintiffs is greater than that due defendants; and if such balance in any amount be so found for defendants, the court will render judgment in favor of defendants against plaintiffs accordingly, declaring said deeds to be mortgages securing same, and order foreclosure and sale accordingly as by law provided.

Let the judgment be reversed and the cause remanded for new trial, not inconsistent with the views herein expressed.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 879, §2853; 2 R. C. L. p. 203; 1 R. C. L. Supp. p. 442; 4 R. C. L. Supp. p. 91. (2) 4 C. J. p. 882, §2854.